UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff, Case No. 26-20200

v. Hon. Matthew F. Leitman

DIONDRE CONERLY,

Defendant.
________________________________/

**MOTION TO DISMISS THE INDICTMENT UNDER THE SECOND AMENDMENT**

Diondre Conerly, through counsel, respectfully moves this Court to dismiss the indictment under the Second and Fifth Amendments to the United States Constitution and Federal Rule of Criminal Procedure 12(b). In support, Conerly states:

1. Conerly is charged by indictment with two counts of possessing firearms as a prohibited person in violation of 18 U.S.C. § 922(g)(1). (ECF No. 18, Indictment, PageID.37–38.) As in the attached brief, this statute is unconstitutional facially and as applied to Conerly.

2. If "the Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct."

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

3. After *Bruen*, the Sixth Circuit attempted to provide guidance in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), holding that § 922(g)(1) is constitutional "as applied to dangerous people" because "historical tradition . . . reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous." *Id.* at 663.

4. As described below and in the attached brief, many of Conerly's prior convictions are stale and occurred while he was a youthful offender. Moreover, not one sheds light on whether he is *currently* dangerous.

a. In 2007, Conerly, then aged 18, pleaded guilty to unlawful driving away of a motor vehicle and an attempt to do the same in violation of Michigan Compiled Laws § 750.413. He

initially received a deferred prosecution under HYTA, was given credit for 51 days of jail time, and ordered to complete two years of probation. However, Conerly violated probation by failing to report and ultimately went to boot camp and jail for eleven months.

b. In 2008, 20-year-old Conerly was charged with unlawful driving away of a motor vehicle, Michigan Compiled Laws § 750.413, and receiving and concealing stolen property, *id.* § 750.535(2)(a). A few months later, he pled guilty to the unlawful driving away charge and the State dismissed receiving stolen property charge. Conerly initially received a probationary sentence, but it was later revoked and he again served eleven months in custody.

c. In 2014, Conerly, then 25 years old, faced attempted larceny charges in violation of Michigan Compiled Laws § 750.356(2)(a) based on an unsuccessful attempt to take jewelry from a store. He pled guilty and received a ten-month jail sentence and a three-year term of probation.

d. Conerly pled guilty to carrying a concealed weapon, Michigan Compiled Laws § 750.227, and

assaulting/resisting/obstructing a police officer, *id.* § 750.81d(1), in 2019. The resisting/obstructing charge stemmed from Conerly's attempt to flee from the police. The state court sentenced him to ninety days of probation and two years and ninety days of probation. He was allowed to self-report to custody.

e. Finally, in 2023, Conerly was convicted of felony assaulting/resisting/obstructing a police officer and received probation. The lenient sentence suggests the case did not involve assaulting an officer, as does the fact that the other charge was a misdemeanor for operating a car without a license.

5. As fleshed out in greater detail in the attached brief, in addition to being stale, four of Conerly's prior convictions occurred while he was a youthful offender. Moreover, none of his prior convictions involved violence. Finally, the status offenses he stands accused of before this Court also did not involve violence.

6. Conerly's criminal record does not support the conclusion that he is dangerous. Because Conerly is not dangerous, this Court should conclude that § 922(g)(1) is unconstitutional as applied to him.

7. If the Court is unable to make a dangerousness determination on the papers, Conerly respectfully requests that the Court conduct an evidentiary hearing so that he may fully discharge his burden of proving that he is not dangerous.

8. Separately, Conerly raises two due process challenges to § 922(g)(1) based on *Williams*'s interpretation of that statute. In addition to being unworkable, *Williams*'s reading of § 922(g)(1) is both facially overbroad and void for vagueness. Dismissal of the indictment on due process grounds is thus warranted.

9. Government counsel does not concur with the relief sought. *See* L.R. 7.1.

Conerly respectfully asks this Court to dismiss count one of the indictment either on the papers or following an evidentiary hearing.

Respectfully submitted,

s/Benton Martin
s/ Laura Danielle Mazor
Attorneys for Diondre Conerly
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5542
E-mail: benton_martin@fd.org

Dated: May 29, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff, Case No. 26-20200

v. Hon. Matthew F. Leitman

DIONDRE CONERLY,

Defendant.
__________________________________/

**BRIEF IN SUPPORT OF MOTION TO DISMISS**
**<u>UNDER THE SECOND AMENDMENT</u>**

"[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). In adjudicating Second Amendment challenges, this Court's task is to determine (1) whether the Second Amendment's plain text covers Conerly's conduct and (2) whether Conerly is currently dangerous such that § 922(g)(1)'s permanent ban on firearm possession is constitutional as applied to him. *Bruen*, 597 U.S. at 17; *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024). Because the Second Amendment's text protects Conerly's right to "keep Arms" and because Conerly is not currently dangerous, he moves the Court to

dismiss the indictment. In the alternative, he asks the Court to conduct an evidentiary hearing on the issue of his dangerousness.

Separately, *Williams* created new legal infirmities, and Conerly asserts two due process flowing directly from it. First, *Williams* acknowledged § 922(g)(1) suffers an overbreadth problem. 113 F.4th at 659 (holding § 922(g)(1) constitutional as applied only to dangerous people). But instead of striking it down, it created a dangerousness test that both violates the separation of powers and is hopelessly vague. Dismissal of the indictment on due process grounds is thus warranted.

## I. FACTUAL BACKGROUND

### A. Conerly's criminal history

Conerly has a handful of prior convictions, none of which involved violence or assaultive conduct. In 2007, Conerly, then 18 years old, pled guilty to unlawful driving away of a motor vehicle and an attempt to do the same, both in violation of MCL § 750.413. For these offenses, he received a deferred prosecution under HYTA, was given credit for 51 days of jail time, and ordered to complete two years of probation. Conerly violated probation by failing to report and ultimately went to boot camp followed by jail for eleven months.

In 2008, Conerly, then 20, was again charged with unlawful driving away of a motor vehicle, *id.*, and receiving and concealing stolen property, *id.* § 750.535(2)(a). In 2011, he pleaded guilty to the unlawful driving away charge and the State dismissed receiving stolen property charge. He received two years of probation, which was later revoked. He served eleven months in custody.

In 2014, Conerly, age 25, faced a charge for attempted larceny, under MCL § 750.356(2)(a), based on an unsuccessful attempt to take jewelry from a store.[1] He received a ten-month jail sentence and a three-year term of probation. Although Conerly violated probation, the violation was for not attending *or* arriving late to a court-ordered Ceasefire meeting. Certainly, the latter is less problematic than the former. Either way, the court continued his probation.

In 2019, Conerly pled guilty to carrying a concealed weapon, MCL § 750.227, and assaulting/resisting/obstructing a police officer, *id.* § 750.81d(1). The resisting/obstructing charge stemmed from Conerly's

[1] Pretrial Service's Bail Report miscalculated Conerly's age at the time his arrest for this offense. Conerly's birthday is September 17, 1988, which means he was 25 on August 22, 2014 (the date of his arrest).

attempt to flee from the police. The state court sentenced him to ninety days of probation and two years and ninety days of probation.

Finally, in 2023, Conerly was again convicted of felony assaulting/resisting/obstructing a police officer and received probation. The lenient sentence suggests Conerly did not assault a police officer, as does the fact that the other charge was a misdemeanor for operating a car without a license. The common sense inference is that Conerly failed to immediately comply when police initiated a traffic stop.

### B. Conerly's federal case

On March 18, 2026, the government filed a two-count criminal complaint alleging Conerly possessed guns in violation of 18 U.S.C. § 922(g)(1) on two separate days in February of 2026. (ECF No. 1, Compl.)

On February 6, 2026, Conerly was arrested by Detroit police for possessing a gun while delivering pizzas on Detroit's westside. He was initially charged in state court, but the case was ultimately dismissed without prejudice for insufficient evidence after the preliminary examination. (*Id.* at PgID.5–6.) This conduct forms the basis of Count 1. (ECF No. 18, Indictment, PgID.37.)

Separately, on February 26, 2026, Detroit police officers initiated a traffic stop of Conerly's car because the license plate was expired and the car had no insurance on file. (ECF No. 1, Compl., PgID.6.) Conerly allegedly ignored commands to pull over. While the police followed Conerly, they allegedly observed him throw something from his car into a trash can. (*Id.*) According to Detroit police who later searched the trash can, a loaded gun was found inside. (*Id.* at PgID.7.) This conduct forms the basis of Count 2. (ECF No. 18, Indictment, PgID.38.)

Conerly made his initial appearance in federal court on March 19, 2026. The government sought temporary detention. (ECF No. 10.) At the detention hearing, Magistrate Judge Patti imposed a host of restrictions on Conerly—including home confinement—but did grant him bond. During that hearing, Judge Patti spoke about Conerly's dangerousness. He noted that Conerly had prior felony convictions that involved fleeing and weapons but underscored that Conerly did not have priors that entailed Conerly acting violently, discharging weapons, or engaging in assaultive conduct. (Detention Hr'g Audio, ECF No. 14, 47:18–47:44.)

A review of the detention hearing audio reveals Judge Patti felt compelled to impose home incarceration because Conerly worked as a

pizza delivery driver even though he lacked a driver's license and car insurance, as evidenced by his lengthy driving record, and thus knew he should not drive. Judge Patti expressed hesitation about taking someone out of their job but was concerned that Conerly would continue delivering pizzas and that he would arm himself while doing so given that he delivered pizzas in dangerous Detroit neighborhoods and this was the likely reason Conerly had guns to begin with. Moreover, Judge Patti did not want to "reward" Conerly for all his misdemeanor traffic infractions for driving without a license and/or insurance or for his failure to appear in court to resolve those charges. (*Id.* at 57:25–58:50.)

After the detention hearing, the government obtained an indictment charging Conerly with two counts of possessing guns.

## II. LEGAL STANDARDS

A party may move to dismiss a defective indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). A defendant may move to dismiss on the basis that "the statute apparently creating the offense is unconstitutional." *United States v. Rathburn*, 771 F. App'x 614, 623 n.8 (6th Cir. 2019) (quotation omitted).

A statute is facially unconstitutional when the challenger has "'establish[ed] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In contrast, a paradigmatic as-applied challenge tests only whether the contested "law is unconstitutional as enforced against the [party] before the court" based on the discrete facts in the case. *Speet v. Schutte*, 726 F.3d 867, 872 (6th Cir. 2013).

## III. ARGUMENT

### A. Section 922(g)(1) is unconstitutional as applied to Conerly.

#### 1. Analytical framework

Following the Sixth Circuit's decision in *Williams*, there can be no question that Conerly's conduct—his possession of guns—is covered by the Second Amendment's plain text. 113 F.4th at 649 (confirming that felons are among "the people" protected by the Second Amendment); *see also United States v. Rahimi*, 602 U.S. 680, 701–02 (2024) (rejecting argument that the Second Amendment protects only "responsible" and

"law-abiding" citizens). That is, Conerly possessed arms consistent with the Second Amendment's unqualified command. U.S. Const. amend. II.

The § 922(g)(1) charges thus turn on whether Conerly is a "dangerous person" who may be permanently disarmed. *Williams* holds § 922(g)(1) constitutional "as applied to dangerous people" because "historical tradition . . . reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous." 113 F.4th at 663.

The dangerousness test focuses on "judicially noticeable information" related to "a defendant's [] criminal record." *Id.* at 660, 659. That is not to say, however, that the dangerousness inquiry is limited to a person's criminal record. *See id.* at 658 n.12 (leaving "the question of what [other] information is relevant for another day").

Focused as it was on criminal records, *Williams* instructs courts to evaluate dangerousness based on "categor[ies]of crime." The first category is "crimes against the person," which includes "violent crimes like murder, rape, assault, and robbery." *Id.* at 658. People convicted of

these crimes face, at minimum, an "extremely heavy" burden to show they are not dangerous, but the availability of the death penalty for the enumerated offenses at the founding "might indicate an irrebuttable presumption of dangerousness." *Id.*

The second *Williams* category consists of crimes "not strictly [] against the person," but that "may nonetheless pose a significant threat of danger." *Id.* at 659. "These crimes do not always involve an immediate and direct threat of violence against a particular person" but may "lead[] to violence" and/or "put someone's safety at risk," thus justifying "a finding of danger." *Id.* This category includes crimes such as drug trafficking and burglary, which at common law, meant breaking and entering the dwelling of another at night with the intent to commit a felony therein. *Id.* Burglaries are dangerous because they "create[] the possibility of a violent confrontation between offender and occupant." *Id.* (quotation omitted). A person with convictions in this category "will have a very difficult time . . . showing that he is not dangerous." *Id.*

The last category of crimes includes mail fraud, making false statements, and other crimes that typically "cause no physical harm to another person or the community." *Id.* *Williams*, however, "trust[s]

district courts will have no trouble concluding that many of these crimes don't make a person dangerous" and that a person so convicted cannot be constitutionally disarmed. *Id.*

### 2. Application of *Williams*'s dangerousness framework

None of Conerly's prior felony convictions are crimes of violence or involved violence. Indeed, none were "crimes against [a] person" and all are insufficiently similar to the first category of crimes articulated in *Williams* such as "murder, rape, assault, and robbery." 113 F.4th at 658. Nor are his prior convictions analogous to the second category of offenses that may "lead[] to violence" such as drug trafficking and burglary. *Id.* at 659. To be fair, the crimes do not map neatly onto those set forth in *Williams*'s third category crimes *Williams* but, like those in that category, the crimes Conerly was convicted of typically "cause no physical harm to another person or the community." *Id.*

In 2007—nearly twenty years ago when Conerly was just 18 years old—he was convicted of unlawful driving away and attempted unlawful driving away in violation of Michigan Compiled Laws § 750.413. He pled guilty to the same offense in 2008, when he was 20. The relevant statute provides:

> Any person who shall, wilfully and without authority, take possession of and drive or take away, and any person who shall assist in or be a party to such taking possession, driving or taking away of any motor vehicle, belonging to another, shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 5 years.

*Id.*

Unlawful driving away is simply another way of saying stealing a car or taking it without the owner's permission. The underlying facts are unclear, but Conerly could have been convicted of this offense if he took his cousin's car without permission. Putting this aside, these convictions occurred nearly twenty years ago, which strongly suggests they should be given little, if any, weight in determining Conerly's current dangerousness. *See, e.g.*, *United States v. Green*, No. 23-CR-20506, 2024 WL 4469090, at *3 (E.D. Mich. Oct. 10, 2024) (Behm, J.) (13-year-old conviction should not be weighed heavily when determining dangerousness). *See also United States v. Jennings*, 754 F. Supp. 3d 763, 770 (E.D. Mich. 2024) (Berg, J.) (noting that court would be inclined to give little weight to defendant's 27-year-old *armed robbery* conviction if he had been a model citizen in the interim but that defendant had committed several other dangerous crimes afterward); *United States v. Buford*, No. 23--20375, 2024 WL 5239444, at *6 (E.D. Mich. Dec. 27, 2024)

(Berg, J.) ("*Williams* gives no specific guidance as to whether, in making the dangerousness decision, district courts should give less weight to convictions for *violent crimes* which occurred long ago. Common sense, however, strongly suggests they should be given less weight.") (emphasis added). This is consistent with how the guidelines treat old convictions. *See* U.S.S.G. § 4A1.2(e)(1)–(3) (excluding certain old convictions from criminal history score computation).

The Court should also consider Conerly's youth at the time of the unlawful driving away convictions. He was 18 and 20 at the time of these convictions, thus making him a youthful offender. This Court may take judicial notice of Conerly's age under Federal Rule of Evidence 201. Certainly, his youth at the time is relevant, as just a few years ago, the Supreme Court unequivocally stated that "youth matters" in determining punishment. *Jones v. Mississippi*, 593 U.S. 98, 105 (2021). Indeed, it has acknowledged "what 'any parent knows'" and what research has repeatedly shown: juveniles and emerging adults are different. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Developments in brain science show fundamental differences between juvenile and adult minds, including in the parts of the brain involved in behavior control. *See* Mariam Arain, et

al., *Maturation of the Adolescent Brain*, 9 Neuro. Disease & Treatment 453 (2013). The prefrontal cortex of the brain does not reach majority until *around* age 25, and this part of the brain controls impulse control, complex decision-making, inhibition, and planning. *Id.*[2]

Following this science, at least one judge in this district has concluded that "[b]rain development and neuroscience . . . strongly suggest" that youthful criminal conduct "should be given less weight" in evaluating dangerousness for purposes of the Second Amendment. *See United States v. Ewing*, No. 24-20071, ECF No. 45, Op. & Order, PageID.619–20 (E.D. Mich. Oct. 28, 2024) (Berg, J.) (discussing "clearly established" neuroscience research showing "that young people's brains are not fully developed such that they are more likely to act impulsively and recklessly, to be vulnerable to negative influence and peer pressure, and to lack a sense of responsibility and the ability to understand long-term consequences.").

[2] U.S.S.C., *Youthful Offenders in the Federal System*, at 5 (May 2017) (noting a voluminous body of research "recogni[zing] that people may not gain full reasoning skills and abilities until they reach age 25 on average"); Nico U.F. Dosenbach et al., *Prediction of individual brain maturity using fMRI*, Science (Sept. 10, 2010) (longitudinal study tracking brain development in 5,000 children and finding their brains did not reach full maturity until *at least* age 25).

The conduct underlying Conerly's next felony conviction occurred in August 2014, more than ten years before the charges in this case and when Conerly was 25 and thus still a youthful offender. That conviction, for attempted larceny in violation of Michigan Compiled Laws § 750.356(2)(a), was based on his unsuccessful attempt to steal jewelry from a local wholesale store. In October of 2014, after Conerly entered a guilty plea, the court sentenced him to ten months in jail and three years of probation. He apparently violated probation in April 2015 for either not attending or being late to a court-ordered Ceasefire meeting, but probation was continued. For the same reasons discussed above in relation to the unlawful driving away charges, this Court should not give much weight to this conviction when determining Conerly's dangerousness.

In 2019, Conerly pled guilty to carrying a concealed weapon. This conviction does not warrant a dangerousness finding and lifelong disarmament either.

Carrying a firearm is not inherently dangerous and is by its nature activity protected by the Second Amendment. In fact, the State of Michigan recognizes the right to open carry firearms *without any permit*.

What criminalizes concealed carry is the individual's failure to obtain a concealed pistol license by meeting certain licensure requirements. Mich. Comp. Laws § 750.227. Carrying a concealed weapon seemingly falls within the third *Williams* category, where the otherwise protected conduct poses no inherent danger to the community. This is bolstered by the Sixth Circuit, which has previously concluded that carrying a concealed weapon is not a "violent felony" for the purposes of the Armed Career Criminal Act, where it poses no "serious potential risk of physical injury." *United States v. Flores*, 477 F.3d 431, 438 (6th Cir. 2007) ("We hesitate to conclude that the act of carrying a concealed weapon poses such a serious potential risk of physical injury to others when the Michigan Legislature now permits its citizens to carry concealed weapons, provided that they follow certain licensing requirements.") In 2019, Conerly possessed a firearm (it is not clear whether it was loaded) with no threat of danger against any other person. That is all. And at the time of the alleged possession in this case, Conerly had absolutely no other violent or assaultive criminal history.

Engaging in protected activity does not make a person dangerous and *Williams* does not suggest otherwise. *Williams* found the defendant

dangerous based on his multiple prior convictions, which included two aggravated robberies committed with guns, attempted murder, and possessing a gun as a felon, specifically, "stash[ing] a pistol that was used to murder a police officer." 113 F.4th at 662. The case cannot, therefore, be read to stand for the proposition that *any* conviction for possessing a weapon makes someone dangerous.

Finally, Conerly has two prior felony convictions from 2019 and 2023 for assaulting/resisting/obstructing a police officer. These are not crimes of violence, do not make Conerly dangerous, and do not justify the permanent deprivation of a right guaranteed to all by the Constitution.

Title 18 U.S.C. § 16(a) defines a crime of violence as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another[.]" The relevant statute provides: "[A]n individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years[.]" Mich. Comp. Laws § 750.81d(1). Because this statute lists multiple elements in the alternative—that is, several different kinds of behavior that constitutes

a violation—it is "divisible." The modified categorical approach thus applies when determining whether a conviction under this statute qualifies as a crime of violence. *See, e.g.*, *United States v. Covington*, 738 F.3d 759, 763 (6th Cir. 2014).

In *United States v. Love*, the Sixth Circuit held that the defendant's prior conviction for obstruction under the same Michigan statute "is categorically not a crime of violence." 364 F. App'x 955, 959 (6th Cir. 2010). In so holding, it discussed *United States v. Mosley*, which held that § 750.81d(1) consists of "at least two categories—those violations . . . involving an individual who physically injures an officer because he 'assaults, batters, [or] wounds' the officer, and ... [violations] involving an individual who 'obstructs' an officer through 'a knowing failure to comply with a lawful command.'" 575 F.3d 603, 607 (6th Cir. 2009). *Mosley* held that "a knowing failure to comply with a lawful command" conviction "is not a crime of violence." *Id.*

A review of Conerly's bail report reveals that he was convicted of either resisting or obstructing a police officer based on his attempted flight in both 2019 and 2023. He was not convicted of physically assaulting an officer. His failure to comply with a lawful command

conviction is not a crime of violence nor one that involves inherent risks to others.

In sum, Conerly's youthfulness at the time of four of his convictions as well as their stale nature counsel against giving much weight to his unlawful driving away and larceny convictions. For these offenses, as well as the more recent ones, Conerly received lenient punishment, suggesting the state courts did not believe Conerly posed a danger to the community. The fact that Conerly has not been convicted of any crimes against persons or of any crimes involving assaultive or violent conduct speaks volumes to the fact that he is *not* dangerous. And the fact that he engaged in protected conduct by carrying a gun as a pizza delivery driver in Detroit in 2019 after having been robbed before does not make him dangerous either. Conerly should, therefore, prevail on his as applied challenge to § 922(g)(1). Alternatively, this Court should hold an evidentiary hearing on the issue of dangerousness.

## II. *Williams* creates two untenable due process problems.

Conerly raises two related due process claims created in *Williams*'s wake: § 922(g)(1) is (A) overbroad and (B) vague.

### A. Section 922(g)(1) is overbroad and facially unconstitutional.

*Williams* held that § 922(g)(1) is unconstitutional as applied to non-dangerous felons, making the statute overbroad, and facially unconstitutional, as written.[3]

Under the overbreadth doctrine, "[a] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). Even if the "governmental purpose" is "legitimate," "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in light of less drastic means for achieving the same basic purpose." *Aptheker*, 378 U.S. at 508 (quotation omitted).

[3] Although overbreadth challenges are most often raised in the First Amendment context, overbreadth has also applied to a right-to-travel challenge. *See Aptheker v. Sec'y of State*, 378 U.S. 500 (1964). Moreover, *Rahimi* suggests that due process challenges are available in the Second Amendment context. 602 U.S. 701 n.2.

Here, as in *Apthekar*, § 922(g)(1)'s "clarity and preciseness" "make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting." *Id.* at 515. It is not the prerogative of unelected judges to rewrite federal statutes, as doing so violates the separation of powers. Yet this is precisely what *Williams* did in announcing its "dangerous person" test. It did so despite the overbreadth doctrine's instruction that when confronted with a statute that sweeps too broadly, courts are to "hold [the] statute facially unconstitutional even though it has lawful applications, and even at the behest of someone whom the statute can be lawfully applied." *United States v. Hansen*, 599 U.S. 762, 769 (2023); *see also id.* at 770 ("[T]he overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak.").

Section 922(g)(1) is overbroad, making it facially unconstitutional.

**B. *Williams*'s "dangerous person" test is void for vagueness.**

The *Williams* Court "remedied" the overbreadth problem by engrafting a textually untethered dangerousness test on to § 922(g)(1)'s text. Problematically, the test renders § 922(g)(1) unworkable and impermissibly vague.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. Am. V. Supreme Court "cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). "Vague laws . . . hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges." *Id.* They allow "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). All these intolerable risks exist with *Williams*'s "dangerous person" test.

The test creates three tiers or "categor[ies] of crimes." *Williams*, 113 F.4th at 658–60. One category includes "*dangerous* and *violent* crimes *like* murder, rape, assault, and robbery." *Id.* at 658 (emphases added).

Reading this non-exhaustive list, one is left to wonder whether *Williams* is importing a "violent felony" analysis like that once used in the Armed Career Criminal Act (ACCA). But that cannot be, as federal courts' attempts to define "violent felony" for ACCA purposes have yielded "repeated attempts and repeated failures to craft a principled and objective standard [for that term,] confirm[ing] its hopeless indeterminacy." *Johnson v. United States*, 576 U.S. 591, 598 (2015) (holding ACCA's residual clause unconstitutionally vague "denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges").

*Williams* disclaims the idea that "courts facing as-applied challenges must find 'categorical' matches to show a defendant is dangerous," and even calls on district courts to make decisions "depending on the unique circumstances of the individual defendant." 113 F.4th 637 at 660. But, by creating three "categor[ies] of crimes," and instructing judges to evaluate a person's "prior convictions," *Williams* resurrects the type of categorical crime of violence inquiry the Supreme Court has thrice invalidated. *Id.* at 658-60; *Davis*, 588 U.S. 445; *Sessions v. Dimaya*, 584 U.S. 148 (2018) (invaliding 18 U.S.C. § 16's crime of violence residual clause); *Johnson*, 576 U.S. at 604.

*Williams*'s second "category of crimes" suffers the same indeterminacy problem. Such crimes, "may . . . pose a significant threat of danger" because such crimes may "lead[] to violence" and/or "put someone's safety at risk." *Williams*, 113 F.4th 637 at 659. Unlike a violent felony that has the use of force as an element, this is an even more amorphous category. In fact, this category sounds like the residual clause struck down in *Davis*, which provided that a crime of violence is a felony "that by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 588 U.S. at 449 (quoting 18 U.S.C. § 924(c)(3)(B)).

*Williams* confirmed that a categorial approach is called for when it directed district courts to make "informed judgment[s] about how criminals commonly operate." 113 F.4th at 660. Yet how do judges know how criminals commonly operate? "A survey? Expert evidence? [Law and Order?] Google? Gut instinct?" *Johnson*, 576 U.S. at 597 (quotation omitted). Fortunately, the Supreme Court for its part does not allow "the imposition of criminal punishment" to "depend on a judge's estimation of

the degree of risk posed by a crime[]" based on his or her opinion about how criminals commonly operate. *Davis*, 588 U.S. at 453.

In sum, § 922(g)(1), in light of *Williams*'s "dangerous person" test, will prove nearly impossible to apply consistently and there will be "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider." *Johnson*, 576 U.S. at 601. In addition to being untethered from the Second Amendment, *Williams*'s "dangerous person" test makes it impracticably difficult to know who § 922(g)(1) will apply to. In other words, § 922(g)(1) now lacks fair notice. Those who have been convicted of felonies cannot know in advance of a court's retroactive declaration whether possessing a gun post-conviction is a constitutional entitlement or a federal crime. Under the *Williams* test, § 922(g)(1) is so vague as to be facially unconstitutional.

*Williams*'s test is unworkable for an additional reason: it makes § 922(g)(1)'s *mens rea* impossible to establish. In *Rehaif v. United States*, 588 U.S. 225, 227 (2019), the Supreme Court held that to convict a defendant under § 922(g), the government must prove the defendant not only knew that he possessed a gun, but also knew that "he had the

relevant status when he possessed it." Insofar as no "dangerousness" finding was previously made for Conerly, he could not have possibly known whether he belonged to the category of persons who may never possess a gun again.

## CONCLUSION

This Court should grant Conerly's motion and dismiss the indictment. In the alternative, the Court may order an evidentiary hearing on the issue of dangerousness.

Respectfully submitted,

s/Benton Martin
s/ Laura Danielle Mazor
Attorneys for Diondre Conerly
613 Abbott Street, Suite 500
Detroit, Michigan 48226
Phone: (313) 967-5542
Email: benton_martin@fd.org

Dated: May 29, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send any required notification to opposing counsel.

*/s/ Benton Martin*